390 So.2d 40 (1980)
In re ESTATE of Leo GREENBERG, Deceased.
No. 58794.
Supreme Court of Florida.
October 30, 1980.
*41 I. Meyer Pincus, in pro. per.
Gene Glasser of Abrams, Anton, Robbins, Resnick & Schneider, Hollywood, for the Greenberg Estate, appellee.
Jim Smith, Atty. Gen. and Bruce Barkett and Thomas A. Beenck, Asst. Attys. Gen., Tallahassee, for Attorney General, amicus curiae.
James G. Pressly, Jr. of Gunster, Yoakley, Criser & Stewart, Palm Beach, for The Florida Bar, Real Property, Probate and Trust Law Section, amicus curiae.
*42 ALDERMAN, Justice.
Meyer Pincus appeals an order of the circuit court denying his petition for appointment as a co-personal representative of the estate of Leo Greenberg. Upholding the constitutionality of sections 733.302 and 733.304, Florida Statutes (1977), the trial court denied this petition on the basis that Pincus was not a resident of Florida and was not related to Greenberg. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution (1972). Against challenges that they violate the equal protection and due process clauses of the fourteenth amendment and the privileges and immunities clause of article IV, section 2 of the Constitution of the United States, we uphold the constitutionality of sections 733.302[1] and 733.304[2] and affirm.
Under these statutory provisions, a nonresident of Florida who is not related to decedent as specified in section 733.304 may not qualify as a personal representative. Pincus claims that the residency classification established by these statutes violates the equal protection clause of the fourteenth amendment and maintains that in evaluating his equal protection challenge, we should not apply the rational basis test normally applied in evaluating such challenges, but instead we should utilize the strict scrutiny test because the act impinges on the testator's "fundamental" right to appoint his personal representative and fundamental right to travel and abridges Pincus's right to pursue a livelihood.
The rational basis or minimum scrutiny test generally employed in equal protection analysis requires only that a statute bear some reasonable relationship to a legitimate state purpose. That the statute may result incidentally in some inequality or that it is not drawn with mathematical precision will not result in its invalidity. Rather, the statutory classification to be held unconstitutionally violative of the equal protection clause under this test must cause different treatments so disparate as relates to the difference in classification so as to be wholly arbitrary. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Walters v. City of St. Louis, 347 U.S. 231, 74 S.Ct. 505, 98 L.Ed. 660 (1954).
The strict scrutiny analysis requires careful examination of the governmental interest claimed to justify the classification in order to determine whether that interest is substantial and compelling and requires inquiry as to whether the means adopted to achieve the legislative goal are necessarily and precisely drawn. Examining Board v. Flores De Otero, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). This test, which is *43 almost always fatal in its application, imposes a heavy burden of justification upon the state and applies only when the statute operates to the disadvantage of some suspect class such as race, nationality, or alienage or impinges upon a fundamental right explicitly or implicitly protected by the constitution. Those fundamental rights to which this test applies have been carefully and narrowly defined by the Supreme Court of the United States and have included rights of a uniquely private nature such as abortions, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); the right to vote, Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); the right of interstate travel, Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); first amendment rights, Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); and procreation, Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).
The Supreme Court of the United States has refused to expand fundamental rights beyond those explicitly or implicitly guaranteed by the constitution. Addressing the constitutionality of the Texas statutory system for public education against an equal protection challenge, the Supreme Court, in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), held that the financing system did not impinge on any fundamental right so as to call for application of the strict scrutiny test since education was not a right afforded explicit or implicit protection under the constitution. The Supreme Court carefully delineated the limits of the fundamental rights rationale in its equal protection decisions; explained that the Court does not pick out particular human activities, characterize them as fundamental, and then give them added protection; and emphasized that it was not within the Court's province to create substantive rights in the name of guaranteeing equal protection. It declared that just because state legislation affects a matter gravely important to society, this is not a sufficient basis to characterize it as fundamental. See also Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). Rather, the Court stated that it merely recognizes an established constitutional right and gives to that right no less protection than the constitution itself demands.
Pincus characterizes as fundamental the testator's right to appoint a personal representative, thus impelling application of the strict scrutiny test. We cannot agree since this right is not one explicitly or implicitly guaranteed by the constitution. In fact, the right to make a will and other matters relating thereto such as designation of a personal representative are rights created by statute. The constitution commits to the states the power to control the administration of the estates of their citizens. Labine v. Vincent, 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971); Demorest v. City Bank Farmers Trust Co., 321 U.S. 36, 64 S.Ct. 384, 88 L.Ed. 526 (1944). There is nothing in the federal constitution which would forbid the state legislature to limit, condition, or even abolish the power of testamentary disposition of property within its jurisdiction. We have ofttimes reiterated that the power to alienate property by last will and testament is not an inherent right of a citizen but rather is one derived from legislation. Efstathion v. Saucer, 158 Fla. 422, 29 So.2d 304 (1947); Taylor v. Payne, 154 Fla. 359, 17 So.2d 615 (1944), appeal dismissed, 323 U.S. 666, 65 S.Ct. 49, 89 L.Ed. 647 (1944); In re Sharp's Estate, 133 Fla. 802, 183 So. 470 (1938). See also Simon, Redfearn Wills and Administration in Florida, 5th edition (1977), section 2.03. Notwithstanding the decision of the federal district court in Fain v. Hall, 463 F. Supp. 661 (M.D.Fla. 1979), which we find to be wholly unpersuasive, we hold that the right to appoint a personal representative is not one of the fundamental rights implicating utilization of the strict scrutiny test.
Relying on Shapiro v. Thompson; Dunn v. Blumstein; and Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), Pincus argues that sections 733.302 and 733.304 infringe upon the testator's fundamental right to *44 travel and, therefore, the strict scrutiny test must be applied. The right to travel throughout the states has been recognized by the Supreme Court of the United States as a constitutionally protected right implicating application of the strict scrutiny test whenever this right is penalized or somehow impinged upon by a legislative classification.
In Shapiro v. Thompson, the Supreme Court, employing the strict scrutiny test, struck a one-year durational residency requirement because it imposed a classification on welfare applicants which impinged on their right to travel freely from state to state. The Court held that the waiting period denied welfare benefits to otherwise eligible applicants solely because they recently moved into the jurisdiction. Then, in Dunn v. Blumstein, although holding a Tennessee durational residency requirement unconstitutionally violative of the equal protection clause, the Supreme Court emphasized that its decision was not intended to cast doubt on the validity of appropriately defined and uniformly applied bona fide residency requirements.
Later in Memorial Hospital v. Maricopa County, the Supreme Court held unconstitutionally violative of the equal protection clause an Arizona statute governing medical care for indigents requiring an indigent to be a resident of the county for the preceding twelve months in order to be eligible for free, nonemergency medical care because it impinged on the right of interstate travel by denying newcomers the basic necessities of life. The Court, however, narrowly confining its earlier decisions in Dunn and Shapiro, explained that the right to travel entails more than merely movement and that although a durational residency requirement impinges on the right to travel to some extent, the Court, in Shapiro, did not declare this requirement to be per se unconstitutional because it in some manner affected the right to travel. The Court emphasized that its earlier holding in Shapiro was conditioned on the caveat that some residency requirements would not be penalties upon the exercise of the constitutional right of interstate travel and that Shapiro did not make clear the amount of impact required to give rise to the compelling state interest test. The Court held that the compelling state interest test is triggered by any classification which serves to penalize the exercise of the right to travel but further stated that the right of interstate travel must be seen as ensuring new residents the same right to vital governmental benefits in the state to which they migrate as are enjoyed by other residents of this state.
The Supreme Court, in McCarthy v. Philadelphia Civil Service Commission, 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976), upheld the validity of a municipal regulation requiring employees of the city to be residents of the city as a bona fide continuing residency requirement and held that this residency requirement did not infringe upon McCarthy's right to travel interstate. The Court once again differentiated between a requirement of continuing residency and a requirement of prior residency of a given duration and explained that Shapiro and Dunn did not question the validity of an appropriately defined and uniformly applied residency requirement. The Court found no support for McCarthy's claim that he had a constitutional right to be employed by the City of Philadelphia while he was living elsewhere.
In the recent decision of Califano v. Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978), the Supreme Court, after briefly summarizing the principles espoused in Shapiro, Dunn, and Memorial Hospital, held that the right to interstate travel does not require that a person who travels from one state to another be given benefits superior to those enjoyed by residents of other states to which he travels merely because he enjoyed those rights in the state from which he came.
Pincus transposes the proposition emanating from the fundamental right to travel in suggesting that a testator traveling to Florida must be given superior benefits to those enjoyed by Florida residents since the testator enjoyed those benefits in the state from which he came. The Supreme Court, *45 in Califano, renounced this suggestion and announced that the broader implications of this transposition in other areas of substantive law would destroy the independent power of each state under the constitution to enact laws uniformly applicable to all of its residents. We find that sections 733.302 and 733.304 do not penalize the exercise of the testator's right to travel in the sense contemplated by the Supreme Court in those decisions where it has applied the strict scrutiny test.
Pincus's contention that these statutes impinge on his fundamental right to pursue a livelihood, thereby requiring application of the strict scrutiny test, is also without merit. He characterizes the privilege of serving as a personal representative as the pursuit of a livelihood because, he asserts, it is not unusual for a portion of an estate attorney's income to be derived from the commissions he receives as administrator of his clients' estates. We do not find the incidental aspect of an estate attorney serving as a personal representative equivalent to what has been defined as the fundamental right to pursue a livelihood. There is no fundamental right to serve as a personal representative of an estate just as there is no fundamental right explicitly or implicitly guaranteed by the constitution to designate a personal representative. Cf. McCarthy v. Philadelphia Civil Service Commission; Massachusetts Board of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).
Pincus's asserted infringement of his right to pursue a livelihood bears no resemblance to the infringement of this fundamental right found to exist in Hicklin v. Orbeck, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), wherein the Supreme Court struck an Alaska hire law requiring that all Alaska oil and gas leases, easements, or right-of-way permits for oil and gas pipelines purposes, unitization agreements, or any renegotiation of any of these to which the state is a party contain a provision requiring the employment of qualified Alaska residents in preference to nonresidents and imposing a one-year durational residence requirement.
Concluding that a Montana elk hunting statute did not deprive anyone of a means of livelihood, the Supreme Court, in Baldwin v. Montana Fish and Game Commission, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), reiterated that some distinctions between residents and nonresidents merely reflect the fact that this is a nation composed of individual states and are permitted. Only those distinctions which hinder the formation, purpose, or development of a single union are prohibited.
The incidental commissions of a personal representative are not "sufficiently basic to the livelihood of the Nation that the States may not interfere with a nonresident's participation therein without similarly interfering with a resident's participation." Baldwin v. Montana Fish and Game Commission, 436 U.S. at 388, 98 S.Ct. at 1862-1863. Indisputably, Pincus has no absolute right to pursue his chosen livelihood as an estate attorney in Florida. See Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); In re Griffiths, 413 U.S. 717, 98 S.Ct. 2851, 37 L.Ed.2d 910 (1973); Silverman v. Browning, 414 F. Supp. 80 (D.C.Conn. 1976), aff'd, 429 U.S. 876, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976). See also Leis v. Flynt, 439 U.S. 438, 99 S.Ct. 698, 58 L.Ed.2d 717 (1979).
Since neither a suspect class nor a fundamental right is affected by the legislation in question, the rational basis or minimum scrutiny test applies in evaluating the equal protection challenge. Utilizing this test, we hold that the distinctions drawn by sections 733.302 and 733.304 bear a reasonable relationship to a legitimate state objective and therefore do not violate the equal protection clause. The state, in enacting these provisions, recognized that the administration of a decedent's estate is an intensely localized matter requiring the personal representative to be thoroughly informed on local matters and to be available to the court, beneficiaries, and creditors of the estate. The state declares that these statutes serve the valid function of ensuring that the personal representative, if not *46 a relative of the testator, is close enough in proximity to the Florida estate to protect the rights of the creditors, ensure that the estate will be probated without needless delays caused by travel, and reduce the cost of representation to the estate by reducing travel costs or preventing the need to associate an in-state representative. In In re the Estate of Fernandez, 335 So.2d 829 (Fla. 1976), we expressly recognized that the residency requirement, along with the statutory provision that a person incompetent to discharge the duties of a personal representative is not qualified to serve, guarantees the basic ability to perform the duties of a personal representative.
Pincus further maintains that the exemption in section 733.304 for nonresident relatives of a decedent demonstrates that the statute is irrational. We disagree. Where utilizing the rationality test, the equal protection clause is not violated merely because a classification made by the laws is not perfect. Equal protection does not require a state to choose between attacking every aspect of the problem or not attacking it at all, and a statutory discrimination will not be set aside if any statement of facts reasonably may be conceived to justify it. Dandridge v. Williams. To be constitutional, a statutory classification need not be all-inclusive. Newman v. Carson, 280 So.2d 426 (Fla. 1973). Furthermore, we find that it is not unreasonable for an exception to be created for nonresident relatives because, more than likely, the nonresident relative will also be a beneficiary of the decedent's estate.
Finding no violation of the equal protection clause, we proceed to Pincus's contention that sections 733.302 and 733.304 violate the due process clause of the fourteenth amendment because they create an irrebuttable presumption that otherwise competent persons are not qualified to serve as personal representatives because of their nonresidency. Relying upon Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Vlandis v. Kline, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); and Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), he argues that his presumed inability to serve is predicated on his status as a nonresident and that the irrebuttable presumption arises when he is not permitted to rebut the assumed conclusion.
Stanley v. Illinois dealt with a due process challenge to an Illinois law under which children of unwed fathers become wards of the state upon the death of the mother. This law created a presumption that a father was unfit because he was not married to his child's mother. Upon the death of the mother of Stanley's children with whom he had lived intermittently for eighteen years, the children were declared wards of the state without a hearing having been held to determine Stanley's fitness as a father. The Supreme Court addressed the issue of whether a presumption that distinguishes and burdens all unwed fathers is constitutionally repugnant and held that, as a matter of due process, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him. The Court made it clear that in considering whether a due process violation existed, the court must begin with a determination of the precise nature of the governmental function involved as well as the private interest affected by the legislation since due process of law does not require a hearing in every conceivable case of governmental impairment of a private interest. Alluding to its previous decisions of Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Skinner v. Oklahoma; and Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), which have emphasized the importance of the family and what has been characterized as the essential rights to conceive and to raise one's children, the Court found that Stanley's interest in retaining custody of his children was substantial and warranted great deference.
Although acknowledging the state's right to classify students as residents and nonresidents, the Supreme Court, in Vlandis v. Kline, struck as violative of the due process clause a Connecticut statute which permanently *47 and irrebuttably classified as nonresidents for purposes of determining tuition and fees those married students whose legal address was outside the state at the time of their applications for admission and those unmarried students whose legal address was outside of Connecticut for any part of the one-year period preceding admission application. This statutory presumption effectually allowed the state to classify as "out-of-state students" those who were actually bona fide residents of the state. The Supreme Court held the statutory presumption invalid on the basis that the presumption of nonresidence is "not necessarily or universally true in fact" and because the state had "reasonable alternative means of making the crucial determination" of residence and held that due process required that the state allow an individual an opportunity to present evidence demonstrating that he is a bona fide resident entitled to in-state rates.
A mandatory maternity leave rule for schoolteachers was stricken by the Supreme Court in Cleveland Board of Education v. LaFleur as violative of the due process clause because it established a conclusive presumption of the physical incapacity of the teacher after the fourth or fifth month of pregnancy, which presumption was neither necessarily nor universally true. The Supreme Court, in applying this strict test and in finding the presumption unconstitutional, placed much emphasis on the fact that the maternity leave regulation affected one of the basic civil rights of man and penalized the recognized fundamental constitutional freedom of personal choice in matters of marriage and family life.
The irrebuttable presumption rationale employed by the Supreme Court in Stanley, Vlandis, and Cleveland Board of Education, which has been characterized by several of the justices as the equal protection clause masquerading as the due process clause,[3] has been considerably narrowed by the Supreme Court in subsequent decisions.
In Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), an Iowa statutory requirement that a petitioner in a divorce action be a resident of the state for one year preceding the filing of the petition was asserted to violate the due process clause on the alleged ground that it denied the litigant the opportunity to make an individualized showing of bona fide residence. Mr. Justice Rehnquist, who had dissented in Vlandis v. Kline, authored the majority opinion holding that the residency requirement did not violate the due process clause and reasoned:
An individualized determination of physical presence plus the intent to remain, which appellant apparently seeks, would not entitle her to a divorce even if she could have made such a showing. For Iowa requires not merely "domicile" in that sense, but residence in the State for a year in order for its courts to exercise their divorce jurisdiction.
419 U.S. at 409-10, 95 S.Ct. at 562. The Court noted that the states have virtually an exclusive province over the regulation of domestic relations.
Then, in Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), in evaluating a due process violation claim addressed to a federal statute which precluded widows and their children from receiving social security survivors' benefits unless the claimant's relationship to the wage earner existed for at least nine months before his death, the Supreme Court again substantially restricted the application of the stricter irrebuttable presumption rationale earlier announced. The Court distinguished Stanley v. Illinois, Vlandis v. Kline, and Cleveland Board of Education v. LaFleur, and, applying a rational relationship test to determine the validity of this conclusive legislative presumption, the Court upheld its validity and explained:
[T]he question raised is not whether a statutory provision precisely filters out *48 those, and only those, who are in the factual position which generated the congressional concern reflected in the statute. Such a rule would ban all prophylactic provisions, and would be directly contrary to our holding in Mourning, supra [Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973)]. Nor is the question whether the provision filters out a substantial part of the class which caused congressional concern, or whether it filters out more members of the class than nonmembers. The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. We conclude that the duration-of-relationship test meets this constitutional standard.

422 U.S. at 777, 95 S.Ct. at 2472-2473 (emphasis added).
Subsequently, in Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Supreme Court clarified its holding in Weinberger insofar as concerned the limitations it imposed on the irrebuttable presumption doctrine, applied the rational relationship test, and upheld against a due process challenge the constitutionality of a federal law employing two irrebuttable presumptions: (1) a coal miner afflicted with complicated pneumoconiosis is conclusively presumed to be totally disabled due to pneumoconiosis and (2) if the miner has died, it is irrebuttably presumed that he was totally disabled by pneumoconiosis at the time of his death and that his death was caused by pneumoconiosis. The Court explained:
But in a statute such as this, regulating purely economic matters, we do not think that Congress' choice of statutory language can invalidate the enactment when its operation and effect are clearly permissible. Cf. Weinberger v. Salfi, 422 U.S. 749, 767-785 [95 S.Ct. 2457, 2467-2477, 45 L.Ed.2d 522] (1975); McDonald v. Board of Election, 394 U.S. 802, 809 [89 S.Ct. 1404, 1408-1409, 22 L.Ed.2d 739] (1969); United States v. Carolene Products Co., 304 U.S. 144, 154 [58 S.Ct. 778, 784-785, 82 L.Ed. 1234] (1938)......
We have consistently tested presumptions arising in civil statutes such as this, involving matters of economic regulation, against the standard articulated in Mobile, J. & K.C.R. Co. v. Turnipseed, 219 U.S. 35, 43 [31 S.Ct. 136, 138, 55 L.Ed. 78] (1910).
"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate." [Cases omitted.]
Moreover, as we have recognized:
"The process of making the determination of rationality is, by its nature, highly empirical, and in matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it." United States v. Gainey, 380 U.S. 63, 67 [85 S.Ct. 754, 757, 13 L.Ed.2d 658] (1965).
428 U.S. at 23-24, 28, 96 S.Ct. at 2898.
The stricter test enunciated in Stanley v. Illinois and its progeny has been effectively restricted to cases involving fundamental constitutional rights much the same as the compelling interest test in the analysis of equal protection claims. Here, no fundamental rights are impinged, and therefore measured against the reasonableness test enunciated in Weinberger v. Salfi, we conclude that sections 733.302 and 733.304 are *49 constitutional. As we have previously explained, these statutes represent a rational means of accomplishing a legitimate state goal.
Furthermore, we hold that sections 733.302 and 733.304 do not violate article IV, section 2, Constitution of the United States, which provides: "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." Pincus misapprehends the distinctions between the treatment of residents and nonresidents against which the privileges and immunities clause protects. The Supreme Court, in Baldwin v. Montana Fish and Game Commission, defining the limits of the privileges and immunities protection, explained that some distinctions between residents and nonresidents are permitted and that only those distinctions which hinder the formation, purpose, or development of a single union of the states is prohibited. Performing the task of a personal representative does not rise to the level of a privilege or immunity bearing upon the vitality of the nation as a single entity. As has already been noted, the Supreme Court of the United States has acknowledged the state's province in regulating the manner of testamentary dispositions. Pincus has no fundamental right to serve as a personal representative in Florida.
Accordingly, having concluded that sections 733.302 and 733.304 are constitutional, we affirm the trial court's order denying Pincus's petition for appointment as a co-personal representative of the estate of Leo Greenberg.
It is so ordered.
BOYD, OVERTON and McDONALD, JJ., concur.
ENGLAND, J., dissents with an opinion, with which SUNDBERG, C.J., and ADKINS, J., concur.
ENGLAND, Justice, dissenting.
By enacting sections 733.302 and 733.304, Florida Statutes (1977), the Florida Legislature has chosen to forbid certain nonresidents from acting as personal representatives for Florida estates. Leo Greenberg died a resident of Florida leaving a will in which he first named his son and his accountant as co-personal representatives, and then named Meyer Pincus as successor personal representative to his accountant. Pincus was not related to Greenberg by blood or marriage, but he had been Greenberg's attorney and tax advisor before Greenberg moved to Florida. When Greenberg's accountant renounced his right to serve as co-personal representative, Meyer indicated his willingness to serve. He was refused permission, however, by reason of the statutory residency requirements of Florida probate law.
The crucial inquiry in determining whether Pincus may serve as Greenberg's personal representative is not whether he is a resident of Florida, for the statute does not require residency for everyone. Rather, the key question is whether the state can justify on any rational basis denying letters testamentary to Pincus because he happens not to be one of those excepted from the residency requirement; that is, Greenberg's spouse, brothers, sisters, uncles, aunts, nieces, nephews, adopted children, adoptive parents, any relative by lineal consanguinity, or a spouse of any of these persons.
I agree with the majority that the "mere rationality" standard of review is appropriate here, but I firmly believe that the state's classification for qualified nonresident personal representatives is arbitrary and irrational to the point of denying equal protection of the laws.
The state essentially asserts three interests which might justify the statute. Two are so unpersuasive as to require little discussion.
First, the state asserts that the statute eliminates the needless delay in the administration of estates which may be caused by travel. This concern, however, is hardly sound, as it applies no less or more forcefully to the multiplicity of other nonresidents *50 authorized by the statute to serve as personal representatives.[1]
Second, the state contends that the cost of administrating an estate is reduced by eliminating expenses of travel and the association of an in-state representative. The state's interest in reducing the cost of estate representation is commendable, but not defendable. A person who wishes to spend money for the travel of a close personal advisor cannot, in my view, be forbidden to do so without offending basic notions of where government's role begins and ends. The choice to expend the funds amassed in one's lifetime to insure that a close friend will supervise distribution of one's estate surely must come within the ambit of the right to be free from governmental paternalism. The state has no more legitimate interest in preventing a testator's election to spend administrative costs for his estate than it has in selecting his beneficiaries.
The state's third contention in support of these statutes is presumptively plausible. The state suggests that residency insures that a personal representative will be in close proximity to the interests of the Florida estate to protect interested parties' rights, and I believe that goal is a possible justification for the disparate treatment of nonresidents. In fact, however, the statute as drawn is not rationally related to achieving that interest. A review of this statute's history makes this evident.
In 1906 the legislature provided that:
Non-residents, if residing in the United States, may be appointed administrator or have letters testamentary upon the same terms and conditions and subject to the same rules and restrictions as residents of this state.[2]
For over thirty years that provision remained substantially unchanged until it was amended in 1939 to forbid nonresidents from serving unless they were an heir, devisee, or legatee as specified therein, a spouse, father, mother, child, brother or sister of the decedent, or a personal representative appointed prior to the effective date of that amendment.[3]
In 1945 the legislature again amended that statute (codified as section 732.47(1), Florida Statutes (1945 Supp.)),[4] to read:
A person who is not an actual bona fide resident of the State of Florida cannot qualify as a personal representative of an estate in Florida, unless such person is related by blood to the decedent within the third degree or is a spouse of the decedent. However, any person who has qualified in Florida as a personal representative prior to the effective date of this law may continue to serve in such capacity.
In 1947 the legislature first enacted a provision similar to the one challenged here,[5] which provided:
A person who is not an actual bona fide resident of the State of Florida cannot qualify as a personal representative of an estate in Florida, unless such person is a legally adopted child of the decedent and [sic] adoptive parent or is related by lineal consanguinity to the decedent or is a spouse or a brother, sister, uncle, aunt, nephew or niece of the decedent.[6]
That provision was changed as to form in 1974 to what is now section 733.304.[7] One year later the legislature amended the statute to change the residence requirement to *51 a domicile requirement, and to add to the list of eligible nonresidents the spouses of all persons exempt from the residency requirement.[8] Finally, although it occurred after this case was filed below, the legislature continued its amendatory ways by revising the statute to expand the list of eligible nonresidents again, this time to include persons related by lineal consanguinity to spouses, brothers, sisters, uncles, aunts, nephews, and nieces of the decedent.[9]
This historical treatment of nonresident eligibility is revealing. It can be seen that the legislature first imposed no restrictions on a nonresident's service. In 1939 the first restrictions were added, aimed at preventing the service of virtually all nonresidents except certain heirs, devisees, legatees and close relatives of the decedent. In 1945 that provision was amended to exclude heirs from eligibility, expressing the legislature's desire to limit nonresidents' service only to those related by blood to the decedent within the third degree, or to spouses. This, presumably, fostered a proximity interest such as is now asserted by the state to support the statute.
Were the 1945 statute before us, I would find no fault with it. A statute such as that would treat all similarly situated persons alike, and a valid state interest in proximity would thereby be vindicated. I agree with my colleagues that the fourteenth amendment "permits the states a wide scope of discretion in enacting laws which affect some groups of citizens differently than others,"[10] and I agree with them that a statutory classification need not be all-inclusive to be constitutional.[11]
But the state's proximity interest has long since ceased to be protected. Successive amendments to the statute since 1945 have taken all rationality out of the law and evinced a protectionist philosophy which does not, in my view, comport with the fourteenth amendment to the United States Constitution. Each amendment since 1945 has made a slightly larger, and thereby less rational, exception to the proximity goal. The 1947 amendment allowed a limited number of less proximate nonresident relatives to serve. The 1974 amendment permitted adoptive parents and children to serve. The "clincher" came in 1975 when the legislature added to the list of eligible nonresidents the spouses of any of the enumerated relatives. (The 1979 amendment, though not technically relevant here, has continued this blunderbuss trend by allowing nonresident lineal blood relatives of any of the enumerated nondomiciled relatives to serve as personal representatives.)
Clearly, as the statute stood when Pincus applied for letters testamentary, its original purpose of limiting service to residents and close relatives-presumably to vindicate the state's proximity interest-has long since disappeared. In fact, it is fair to say that the "exception" for some nonresidents has swallowed the rule forbidding nonresidents to serve. The kinship tie has become so attenuated that there no longer exists a protectable proximity interest. A close personal advisor, such as Pincus was to Greenberg, is a far more rational choice by the decedent than the choice of remote strangers which the statute would allow.[12]
I would hold the statutory classification now before us to bear no rational relation to any legitimate state interest. The Florida legislature must make up its collective mind either to exclude nonresidents or to permit them to serve; it cannot have matters both ways. I would strike the residency statute and allow Meyer Pincus to serve *52 as co-personal representative for his former client.
SUNDBERG, C.J., and ADKINS, J., concur.
NOTES
[1] Section 733.302 provides:

Subject to the limitations in this part, any person sui juris who is a citizen of the United States and a resident of Florida at the time of the death of the person whose estate he seeks to administer is qualified to act as personal representative in Florida. A person who has been convicted of a felony or who, from sickness, intemperance, or want of understanding, is incompetent to discharge the duties of a personal representative is not qualified.
In In re the Estate of Fernandez, 335 So.2d 829 (Fla. 1976), we held that the United States citizenship requirement contained in section 733.302, Florida Statutes (1975), was invalid because such requirement violated the equal protection clauses of the fourteenth amendment to the United States Constitution and article I, section 2 of the Florida Constitution. Therein, we recognized that the statutory requirement that a person appointed as an administrator be a resident of Florida guaranteed the basic ability of one to perform the duties of a personal representative, but we held that the additional requirement of United States citizenship had no bearing on ability. In 1979, the legislature amended section 733.302 to eliminate the requirement of United States citizenship. Chapter 79-343, Laws of Florida (1979). The amendment deleted only the language, "is a citizen of the United States and," but left the remainder of the statute unchanged.
[2] Section 733.304 provides:

A person who is not domiciled in the state cannot qualify as personal representative unless the person is:
(1) A legally adopted child or adoptive parent of the decedent;
(2) Related by lineal consanguinity to the decedent;
(3) A spouse or a brother, sister, uncle, aunt, nephew, or niece of the decedent; or
(4) The spouse of a person otherwise qualified under this section.
[3] Cleveland Board of Education v. LaFleur, 414 U.S. at 651, 94 S.Ct. at 801-802 (Mr. Justice Powell, concurring in result), 414 U.S. at 657, 94 S.Ct. at 804-805 (Mr. Justice Rehnquist, dissenting); Vlandis v. Kline, 412 U.S. at 459, 93 S.Ct. at 2240 (Mr. Chief Justice Burger, dissenting).
[1] This concern is essentially an argument for administrative convenience which, as indicated by the United States Supreme Court, under certain circumstances, may not be a legitimate basis for discrimination. See Shapiro v. Thompson, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969) (Justice Brennan stating in dicta that "even under traditional equal protection tests," the asserted state interest of administrative convenience "would seem irrational and unconstitutional").
[2] § 2337, Gen.Stat. of Fla. (1906).
[3] Ch. 19671, Laws of Fla. (1939), unofficially codified as § 5541(26), Comp.Gen.Laws of Fla. (1940).
[4] Ch. 22847, Laws of Fla. (1945).
[5] Ch. 22819, Laws of Fla. (1947).
[6] § 732.47(1), Fla. Stat. (1947).
[7] Ch. 74-106, § 1, Laws of Fla.
[8] Ch. 75-220, § 63, Laws of Fla.
[9] Ch. 79-343, § 6, Laws of Fla.
[10] Mones v. Austin, 318 F. Supp. 653, 655 (S.D. Fla. 1970) (3 judge court). Accord, Finlayson v. Conner, 167 So.2d 569 (Fla. 1964).
[11] See, e.g., Railway Express Agency v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949).
[12] The case for co-personal representatives such as Pincus is even more compelling, as all the state's interests are fully protected by the co-representation of decedent's son.